IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FARM CREDIT SERVICES OF AMERICA, FLCA, <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD KNUPPE, <br><br> Defendant. | **8:26CV102** <br><br> **MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Farm Credit Services of America, FLCA, (Farm Credit) brings this action seeking damages and other relief against a former employee, defendant Richard Knuppe. Filing 1. This case is now before the Court on the part of Plaintiff's motion, Filing 4, requesting a preliminary injunction prohibiting the defendant and any individuals working in concert with him from violating his Assignment, Nonsolicitation, and Nondisclosure Agreement (Agreement) with Farm Credit.[1] For the reasons stated below, the Court grants the part of Plaintiff's motion requesting a preliminary injunction.

## I.   INTRODUCTION

### A.  Factual Background

This statement of factual background is drawn from Farm Credit's March 9, 2026, Index of Evidence, Filing 7, the March 27, 2026, exhibits submitted with Farm Credit's reply brief, Filing

---

[1] The Court previously granted the part of Plaintiff's motion requesting a temporary restraining order in its March 11, 2026, memorandum and order. Filing 11.

24, and Knuppe's affidavit, Filing 20-1. [2] Farm Credit's Index of Evidence includes the Verified Complaint, Filing 1, and the first "Declaration of Anthony Jesina,"[3] Filing 7-1. Two exhibits are attached to the declaration. Filing 7-2; Filing 7-3. The evidence Farm Credit submitted with its reply brief includes the second "Declaration of Tony Jesina" and three other exhibits. Filing 24-1 through Filing 24-4. Unless otherwise indicated, the factual statements below appear to be undisputed. The Court's factual findings in this decision are provisional and not binding in future proceedings. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits[.]") (citations omitted); *SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same).

The Verified Complaint alleges that Farm Credit provides certain financial services to ranchers and farmers throughout Iowa, Nebraska, South Dakota, and Wyoming. Filing 1 at 2 (¶ 5). Defendant Knuppe, a resident of South Dakota, Filing 20-1 at 1 (¶ 3), was a Farm Credit Insurance Officer from September 12, 2014, to June 18, 2025, Filing 1 at 2 (¶ 7); Filing 20-1 at 1 (¶ 4). Knuppe's affidavit states that "[p]rior to working at [Farm Credit], [he] had many contacts that [he] had strong personal relationships with, many of whom eventually became [Farm Credit] customers solely because of [his] prior relationships." Filing 20-1 at 2 (¶ 7). On the job, "Knuppe's

---

[2] Much of the case's evidentiary background has been restricted pursuant to various orders. On March 9, 2026, United States Magistrate Judge Ryan C. Carson granted Plaintiff's motion, Filing 6, asking "the Court for permission to file its Index of Evidence in Support of Motion for Temporary Restraining Order and Preliminary Injunction and all pertaining exhibits under restricted access because those documents contain Confidential customer information." Filing 8 (text order). On March 27, 2026, Judge Carson granted Plaintiff's motion, Filing 23, requesting that the evidence it submitted in support of its motion for preliminary injunction be restricted because those documents contain confidential customer information. Filing 25 (text order). Lastly, on March 30, 2026, Judge Carson granted Plaintiff's unopposed motion to restrict Filing 20-1 to case participants and the Court. Filing 27 (text order). The Court's ruling will avoid mention of confidential customer information.

[3] Jesina is "the Senior Vice President of Insurance & Consumer Lending for [Farm Credit]." Filing 7-1 at 1 (¶ 2). Jesina asserts that he has personal knowledge of all the facts contained in the Declaration. Filing 7-1 at 1 (unnumbered paragraph).

duties [allegedly] included, but were not limited to, soliciting crop insurance to existing Farm Credit customers, servicing the customers, as well as identifying, soliciting, and servicing new crop insurance customers on behalf of Farm Credit." Filing 1 at 2–3 (¶ 8); *see also* Filing 20-1 at 1 (¶ 6). According to the second Jesina declaration, "as an employee of Farm Credit, Knuppe's responsibilities included developing and maintaining positive relationships and goodwill with customers and to retain repeat business, all for the benefit of Farm Credit." Filing 24-1 at 4 (¶ 15).

The part of Knuppe's job involving the creation of customer good will was particularly important, according to the first Jesina declaration, because "[t]he federal government regulates the crop insurance industry" and "sets the price of crops (what the insurance payout will be)." *See* Filing 7-1 at 2 (¶ 9). According to Jesina, "[b]ecause the federal government sets the prices, crop insurance agencies cannot compete on price. Agencies therefore compete on customer relationships and superior service." Filing 7-1 at 2 (¶ 10). Knuppe does not appear to dispute that much of the competition in the industry comes by way of customer relationships and quality of service, as his affidavit states that "[t]he customer can choose what features in insurance coverage it wants, and can make its own evaluation of the level of service any insurance officer does or does not provide. This is a factor that goes into a customer's choice of what agency or insurance officer to work with." Filing 20-1 at 3 (¶ 21). However, Knuppe states that the insurance providers that agents can offer vary in terms of the level of technology offered. Filing 20-1 at 3 (¶ 19) ("Rain and Hail is an Approved Insurance Provider (AIP), widely regarded as the superior provider in technology for both the agent and insured."). Accordingly, Knuppe seems to assert that some customers will change insurance agencies or officers in order to use a specific insurance provider. Filing 20-1 at 3 (¶¶ 18–21).

The Verified Complaint alleges that Farm Credit "supported [customer] relationships through training, promotional items, and paying for meetings between Knuppe and customers, among other support. It also allowed him to be the primary contact for Farm Credit to develop relationships with customers on its behalf and for its benefit." Filing 1 at 4–5 (¶ 14). The first Jesina declaration further states, "A critical part of Knuppe's success on behalf of Farm Credit was its reputation and brand, and the Customers' trust in and loyalty to Knuppe, which Farm Credit helped foster and promote."[4] Filing 7-1 at 1–2 (¶ 6). However, Knuppe's affidavit states that "[he] did [his] own education and training on LRP and trained other Farm Credit agents on it."[5] Filing 20-1 at 3 (¶ 25). Knuppe also states that "Farm Credit did not help foster and promote [his] customers' trust and loyalty to [him] as it claims in Doc. 7-1, page 1, paragraph 6. Customers relied on [his] own training and education in LRP, which [he] pursued himself." Filing 20-1 at 4 (¶ 26). Jesina's second declaration states, however, that "[t]o obtain and maintain a license, a crop insurance agent is required to attend continuing education training periodically. During his employment with Farm Credit, Knuppe completed that training at Farm Credit's expense and on work time." Filing 24-1 at 2 (¶ 9). Farm Credit submitted certificates of trainings that Knuppe allegedly completed at Farm Credit's expense and during work time. Filing 24-1 at 2 (¶ 9); Filing 24-2. Additionally, Farm Credit submitted expense reimbursements purporting to show that it paid

---

[4] "Those Farm Credit customers with whom Knuppe actually did business and had personal contact during his Farm Credit employment" are referred to as "Customers" in the Verified Complaint. Filing 1 at 6 (¶ 17). The Court, likewise, uses "Customers" to refer to those individuals with whom Knuppe did business and had personal contact with during his employment with Farm Credit.

[5] Although Knuppe's affidavit and brief do not shed light on what LRP refers to, Filing 19; Filing 20-1, the Court understands LRP to refer to "Livestock Risk Protection." See Filing 1 at 2 (¶ 5) (saying one of the services offered by Farm Credit is Livestock Risk Protection insurance).

for travel, lodging, meals, and other expenses for the purpose of cultivating Customer goodwill. Filing 24-1 at 4 (¶ 15); Filing 24-4.

Knuppe also disputes the allegation that he was the "primary contact with the Customers, and [that] other insurance specialists at Farm Credit were not permitted to be the direct liaison with [the Customers]." Filing 7-1 at 2 (¶ 7). Knuppe states that "[o]ther insurance specialists were permitted to deal directly with customers for whom I was the primary contact. Exclusive contact by one insurance specialist with customers was not the rule at Farm Credit while I worked there." Filing 20-1 at 4 (¶¶ 29–31). Jesina's second declaration, however, states that "[a]lthough other Farm Credit employees may occasionally interact with customers (to follow up on paperwork, provide coverage during vacation, etc.), each customer has only one agent of record." Filing 24-1 at 3 (¶ 11).

It appears undisputed that "[t]hroughout [Knuppe's] employment at Farm Credit, Knuppe occupied a position of substantial trust and confidence." Filing 1 at 3 (¶ 10). As part of Knuppe's employment, "Farm Credit [allegedly] gave Knuppe access to its Salesforce and AgentPro databases and to its customers. It also gave Knuppe access to customer information on the insurance company websites as an appointed agent for Farm Credit." Filing 1 at 4 (¶ 4). The databases allegedly "contain extensive trade secrets and confidential information of Farm Credit." Filing 1 at 3 (¶ 10). The Verified Complaint alleges that as part of Farm Credit's efforts to keep its confidential information secure and secret, "as well as part of its efforts to maintain customer goodwill, Farm Credit required Knuppe and all other similarly situated employees to execute the Agreement." Filing 1 at 5 (¶ 15). Knuppe executed the Agreement on January 1, 2015, "in consideration of continued employment and participation in Farm Credit's short-term incentive

plan." Filing 1 at 2 (¶ 7), 6 (¶ 18) (saying "[t]he execution of the Agreement was a condition of Knuppe's continued employment, his continued access to the Customers, his continued access to confidential information and Trade Secrets . . . in addition to other valuable consideration").

The Agreement states in relevant part,

> **2. NONSOLICITATION OF CUSTOMERS.** For a period of two (2) years following the termination (voluntary or involuntary, for any reason or no reason) of [Knuppe's] employment with [Farm Credit], [Knuppe] shall not, seek or accept employment with, and will not call on or solicit the business of, or sell to, or service (directly or indirectly, on [Knuppe's] own behalf or in association with or on behalf of any other individual or entity), any of the customers of [Farm Credit] with whom [Knuppe] actually did business and had personal contact while employed by [Farm Credit], except to the extent such activities are unrelated to and not competitive with the business, products or services that [Knuppe] offered or provided on behalf of [Farm Credit] and cannot adversely affect the relationship or volume of business that [Farm Credit] ha[s] with such customers.
>
> \*\*\*
>
> **4. NONDISCLOSURE OF CONFIDENTIAL INFORMATION.** During the term of [Knuppe's] employment with [Farm Credit] and following the termination (voluntary or involuntary, for any reason or no reason) of [Knuppe's] employment with [Farm Credit], Employee shall not use for any purpose or divulge, disclose, or communicate to any person or entity, in any manner whatsoever, any Confidential Information acquired during or as a result of [Knuppe's] employment with [Farm Credit]. [Knuppe] agrees that the Confidential Information is proprietary to [Farm Credit] and is owned solely by [Farm Credit], and that the disclosure thereof would cause irreparable harm and damage to the business of [Farm Credit]. [Knuppe] will not access, copy, download, transmit, or reproduce any Confidential Information (whether store electronically or otherwise) for any purpose other than furthering the business interests of [Farm Credit]. [Knuppe] will never use or disclose Confidential Information (even following the termination of employment) for any purpose other than furthering the business interests of [Farm Credit], [Knuppe] shall immediately return to [Farm Credit] . . . all data, materials and other documents containing or related to any Confidential Information belonging [Farm Credit].

Filing 1-1 at 1–2.

According to the Verified Complaint, following Knuppe's resignation from Farm Credit on June 18, 2025, "Knuppe began employment with Logic AG Marketing, a company in direct competition with Farm Credit for crop insurance sale business." Filing 1 at 6–7 (¶ 21). The Verified Complaint avers "[u]pon information and belief, Knuppe, directly and/or indirectly, began calling on, soliciting, selling and/or servicing Farm Credit Customers for the purpose of selling those same Customers crop insurance through a competitor of Farm Credit. Such conduct has adversely affected the relationship and/or volume of business that Farm Credit has with such Customers." Filing 1 at 6–7 (¶ 21). However, Knuppe's affidavit states, "I do not consider [Farm Credit] competition. I'm a licensed commodity broker who also sells insurance. [Farm Credit] cannot offer the same level of options that I can." Filing 20-1 at 2 (¶ 8). The second Jesina declaration disputes Knuppe's statement, saying "[i]n the insurance space, Knuppe sells the same competing insurance products as Farm Credit. Therefore, he is a direct competitor of Farm Credit. The fact that Knuppe may offer different or additional products does not change the fact that he competes directly by selling competing insurance products." Filing 24-1 at 1 (¶ 5).

Specifically, the Verified Complaint maintains that "[w]ith Knuppe's assistance, at least one Customer has requested to move their crop insurance business away from Farm Credit since the termination of Knuppe's employment with Farm Credit." Filing 1 at 7 (¶ 22). Jesina declares that "[i]n or around late February, Farm Credit received a 2-page written request from Gilbert Cattle Company, a Customer with whom Knuppe previously had personal contact and did business while working for Farm Credit." Filing 7-1 at 4 (¶ 19). The request states, "I, Tami Gilbert, member of Gilbert Cattle Company in both North Dakota and South Dakota, would like all my crop insurance business to remain with Rain and Hail. I did not intend to transfer the business away

from Rain and Hail. Please call with any questions." Filing 7-2 at 1. According to a "Final Audit Report" associated with the request, the request document was "created by Rich Knuppe (rich@logicag.com)" and "emailed to Tami Gilbert . . . for signature." Filing 7-2 at 2.

According to the first Jesina declaration, "Rain and Hail is one of many carriers that deliver crop insurance products subject to the rules, rates, policy terms, and underwriting framework set by the USDA." Filing 7-1 at 4 (¶ 21). Jesina further declares that "[a]lthough Farm Credit previously had an agency contract with Rain and Hail, it does not currently maintain an agency contract with Rain and Hail. Instead, Farm Credit partners with other insurance carriers to offer crop insurance products subject to the same rules, rates, policy terms, and underwriting framework as the crop insurance products provided by Rain and Hail." Filing 7-1 at 4 (¶ 22). The declaration goes on, "Historically, Gilbert Cattle Company has used other carriers . . . including RCIS (Rural Community Insurance Company)." Filing 7-1 at 4 (¶ 23). A 2024 Schedule of Insurance provided by RCIS to Gilbert identifies Knuppe as Gilbert's Farm Credit representative. Filing 7-3 at 1.

Knuppe also provides information on Rain and Hail's relationship to the matter. Knuppe's affidavit states that "Rain and Hail is . . . widely regarded as the superior provider in technology for both the agent and insured." Filing 20-1 at 3 (¶ 19). The affidavit also states that "Farm Credit no longer has a contract to use Rain and Hail," and that "Rain and Hail sent letters to all of their customers letting them know [Farm Credit] no longer had a contract with Rain and Hail." Filing 20-1 at 3 (¶ 19). Knuppe further states that "[Farm Credit] has lost customers who wanted to stay with Rain and Hail. The Jessina [sic] Declaration states that normally [Farm Credit] enjoys good retention as long as there isn't a former agent trying to take customers. This is not accurate." Filing 20-1 at 3 (¶ 20). According to Knuppe, "The customer can choose what features in insurance

coverage it wants, and can make its own evaluation of the level of service any insurance officer does or does not provide. This is a factor that goes into a customer's choice of what agency or insurance officer to work with." Filing 20-1 at 3 (¶ 21).

According to Jesina, the request from Gilbert Cattle Company matters because, given that "Farm Credit does not maintain an agency contract with Rain and Hail, it is not possible for Farm Credit to maintain 'all' of the [Gilbert Cattle Company's] insurance business with Rain and Hail. As such, the request prepared by Knuppe for 'all' of [Gilbert Cattle Company's] business 'to remain with Rain and Hail' is effectively a request to transfer the Customer's crop insurance business away from Farm Credit." Filing 7-1 at 4–5 (¶ 24).

The Verified Complaint also maintains,

> [U]pon information and belief, at least six (6) Customers have thus far cancelled policies with Farm Credit, primarily those tied to forage and grazing. Upon information and belief, those Customers moved that business to Knuppe and/or Logic AG. Many of the Customers with whom Knuppe worked had been customers of Farm Credit for several years. Farm Credit assigned Customers to Knuppe to service and allowed him to be the only Insurance Officer for those Customers to the exclusion of others at Farm Credit.

Filing 1 at 7 (¶ 23). Knuppe's affidavit points out that the Jesina declaration and Verified Complaint "do[] not name these customers or explain how Mr. Knuppe's actions had anything to do with 6 policy cancellations." Filing 20-1 at 2. However, although Knuppe states that "[he] did not and do[es] not have any Spring crop policies, let alone any Farm Credit Spring crop policies," Filing 20-1 at 4 (¶ 28), Knuppe nowhere denies that he has solicited, sold to, or serviced the Gilbert Cattle Company or the six Customers on behalf of Logic AG. *See* Filing 20-1. The second Jesina declaration puts names to these six alleged Customers and says that Knuppe was the agent of record for each one of them during his time at Farm Credit. Filing 24-1 at 3 (¶ 13).

9

The Verified Complaint finally alleges that [t]here is no way to calculate the damages attributable to the loss of Customer relationships because it is impossible to measure, for instance, how much the Customer portfolio might have grown if it had not transferred; what assets the Customer may have earned, inherited, or won over time; or what potential referrals the Customer might have made." Filing 1 at 7–8 (¶ 24). Along these lines, the second Jesina declaration states that "[u]nless the customer opts to leave Farm Credit, the crop insurance policies will continue to roll over with Farm Credit. Therefore, it is impossible to know how much Farm Credit will lose in the future as a result of losing these customers for even one season. . . ." Filing 24-1 at 14 (¶ 3).

### B. Procedural Background

On March 9, 2026, Farm Credit filed the Verified Complaint. Filing 1. The Verified Complaint alleges one cause of action: Breach of contract. Filing 1 at 8–10. That same day, Farm Credit filed a Motion for Temporary Restraining Order and Preliminary Injunction and Request for Immediate Hearing. Filing 4. The motion was accompanied by a brief and the Index of Evidence. Filing 5; Filing 7. The Court considered the motion and issued a TRO *ex parte* in its March 11, 2026, order. Filing 11. Pursuant to Federal Rule of Civil Procedure 65(c), the Court required Farm Credit to post a cash or surety bond with the Clerk of Court in the amount of $15,000.00. Filing 11 at 29. Farm Credit deposited $15,000.00 with the Clerk of Court that same day. Filing 12; Filing 13-1.

The Court's March 11, 2026, order set a preliminary injunction hearing for March 18, 2026, at 1:30 p.m. Filing 11 at 29. On March 17, 2026, Knuppe's counsel entered his appearance in the matter. Filing 14. The next day, Knuppe filed an Unopposed Motion to Continue Hearing on Temporary Restraining Order [sic]. Filing 15. Both parties consented to the TRO remaining in

10

effect during the intervening time. Filing 15. The Court granted Knuppe's motion and set the preliminary injunction hearing for March 30, 2026, stating that the TRO would expire on April 2, 2026, at 12:00 a.m., unless otherwise ordered by the Court. Filing 16.

In anticipation of the preliminary injunction hearing, Knuppe filed a Brief Opposing Plaintiff's Motion for Preliminary and Permanent Injunction on March 25, 2026. Filing 19. Knuppe filed an Index containing Knuppe's affidavit. Filing 20. On March 27, 2026, Farm Credit filed a reply brief and submitted additional evidence that included the second Jesina declaration. Filing 22; Filing 24-1. The Court held a hearing on Farm Credit's preliminary injunction motion on March 30, 2026, at 1:30 p.m.

## II.  LEGAL ANALYSIS

### A.  Preliminary Injunction Standards

Federal Rule of Civil Procedure 65 authorizes the courts to issue preliminary injunctions, but it does not identify the standards the Court must apply in deciding whether or not to grant a request for a preliminary injunction. The Eighth Circuit Court of Appeals has filled the gap by explaining, "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025) ("In deciding whether to grant preliminary injunctive relief, courts consider the four *Dataphase* factors: "(1) the threat of irreparable harm to the movant;

(2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114)). No single factor is determinative or dispositive. *Schmitt*, 148 F.4th at 966. Thus, "the court should balance all the factors in considering whether the injunction should be granted." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

The pertinent factors must be considered in the context of certain additional principles. First, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Second, because a preliminary injunction is an extraordinary remedy, "the party seeking a preliminary injunction bears the burden of establishing the necessity of the remedy." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009)), *cert. denied*, 144 S. Ct. 1350 (2024). Third, the "primary function" of a preliminary injunction "is to preserve the status quo until a court may grant full relief upon a final hearing." *Wilbur-Ellis Co., LLC v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025). To put it another way, the purpose of preliminary injunctive relief "is not to give the movant the ultimate relief he seeks." *Lindell*, 82 F.4th at 618. Indeed, "[r]equiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a preliminary injunction." *Tumey*, 27 F.4th at 665 (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993)).

The Court turns to consideration of the *Winter/Dataphase* factors in this case in the context of these principles.

12

### B. Consideration of the *Winter/Dataphase* Factors

#### 1. *Likelihood of Success*

##### a. The Parties' Arguments

Farm Credit argues that the Agreement is valid and enforceable under Nebraska law and that Knuppe breached the agreement. *See generally* Filing 5.

In his brief opposing the motion, Knuppe argues that Farm Credit has failed to show likelihood of success because the Agreement is not valid under Nebraska law. *See* Filing 19 at 5. Specifically, Knuppe maintains that "the non-solicitation clause, combined with defendant's long-time connections with supposed customers, may not be enforceable when the evidence of actual communications by Defendant with a Customer and the Customer's reasons for changing agencies are disclosed." Filing 19 at 5. Knuppe also asserts that "[t]he Jesena [sic] Declaration does not name the 6 canceling customers or explain how Mr. Knuppe's actions had anything to do with 6 policy cancellations." Filing 19 at 6. Additionally, Knuppe argues that customers can choose who to do business with. *See* Filing 19 at 4 ("Plaintiff assumes but does not prove that 6 customers have moved to a different agency because of Defendant's actions. If and when those customers are identified, it may be shown that these were long time friends and people with old connections to Defendant, whose transfer of business was independent of any actions by Defendant after he left Farm Credit.").

Among other things, Farm Credit argues in reply that "[i]n *Mens [II]*, this Court recognized Farm Credit's legitimate interest in preserving its customer goodwill and relationships even though the defendant had 'longstanding, prior personal relationships' with the customers." Filing 22 at 3 (quoting *Mens II*, 456 F. Supp. 3d at 1181–85). According to Farm Credit, "The Court rejected the

13

argument that the customer goodwill belonged to the employee and instead found Farm Credit should 'receive the benefit of [the] customer relationships.'" Filing 22 at 3 (quoting *Mens II*, 456 F. Supp. 3d at 1185–86). Farm Credit also argues that "[t]he Agreement does not restrict Customers' choices; it restricts Knuppe's conduct" and that "[t]his Court has already determined that the Agreement is enforceable, and Customer autonomy does not operate as a contractual escape hatch." Filing 22 at 5.

### b. Requirements to Show Likelihood of Success

The Eighth Circuit has explained,

> "While no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted). [The movant] "must demonstrate that [he] has a 'fair chance' of prevailing on the merits." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "To show a fair chance of prevailing, [the movant] must show that [his] claims provide fair ground for litigation, but [he] need not show that [he] has a greater than fifty per cent likelihood of success." *Id.* at 1016–17 (internal quotation marks and citations omitted).

*Schmitt*, 148 F.4th at 966 (second and fourth alterations by this Court).

### c. The Agreement is Valid Under Nebraska Law

To show a likelihood of success on the merits, Farm Credit must show that the nonsolicitation and nondisclosure agreement is (1) valid and enforceable and (2) that Knuppe violated the agreement. *Farm Credit Servs. of Am., FLCA v. Mens*, 8:19CV14, 2019 WL 285962, at *3 (D. Neb. Jan. 19, 2019) (*Mens I*). The Court first considers whether the nonsoliciation and nondisclosure provisions are valid and enforceable. Nebraska state law governs whether the nonsolicitation and nondisclosure provisions at issue in this case are valid and enforceable. *Progressive Techs, Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485–86 (8th Cir. 2022) (applying

14

Arkansas law to a breach of a restrictive covenant claim); *DCS Sanitation Mgmt., Inc. v. Castillo,* 435 F.3d 892, 897 (8th Cir. 2006) ("[W]e now turn to whether the noncompete agreements are valid under Nebraska law.").

> This Court has previously stated,

> In determining whether a covenant not to compete is valid, a court considers whether the restriction is (1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee." *Aon Consulting, Inc. [v. Midlands Fin. Benefits, Inc.]*, 275 Neb. [642,] 653, 748 N.W.2d [626,] 638 [(Neb. 2008)] (citing *Mertz v. Pharmacists Mut. Ins. Co.*, 261 Neb. 704, 625 N.W.2d 197 (2001)).

*Farm Credit Servs. of Am., FLCA v. Mens*, 456 F. Supp. 3d 1173, 1182–83 (D. Neb. 2020) (*Mens II*). In *Mens II*, this Court held an identical nonsolicitation of customers clause valid and enforceable under Nebraska law. *Id.* at 1177–78, 1186. For the following reasons, the Court finds the nonsolicitation and nondisclosure clauses at issue in this case are also valid and enforceable.

As an initial matter, the Court notes, that the Nebraska Supreme Court has approved of restrictive language nearly identical to that contained in the Agreement's nonsolicitation of customers clause. As this Court has previously noted in a case that concerned an identical nonsolicitation of customers clause,

> The *Aon* court found the language was not overly broad or unenforceable because it did not prevent ordinary competition but rather focused on the "legitimate purpose of protecting [the employer]'s goodwill with its customers." *Id.* at 653, 748 N.W.2d at 638. Accordingly, this Court again finds nothing inherently wrong or overbroad about the requirements of the Agreement because the Agreement accords with Nebraska case law and only prohibits Mens from working with customers with whom she actually worked and had personal contact while employed by Farm Credit.

*Mens II*, 456 F. Supp. 3d at 1183. Here too, the nonsolicitation clause only prohibits Knuppe from working with the customers with whom he actually worked and had personal contact while employed by Farm Credit. Filing 1-1 at 1–2.

In assessing the reasonableness and validity of the Agreement at issue here, the Court applies the tripartite *Aon* test. *Progressive Techs, Inc.*, 33 F.4th at 485–86 (applying Arkansas law to a breach of a restrictive covenant claim); *Aon Consulting, Inc.*, 748 N.W.2d at 633 (providing three factors used to determine whether a restrictive covenant is valid under Nebraska law). The Nebraska Supreme Court "ha[s] suggested that it is often best to consider the second feature [of the *Aon* test] and initially determine if the restraint is in aid of some legitimate interest of the employer." *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127–28 (Neb. 2014) (citing *Boisen v. Petersen Flying Serv.*, 383 N.W.2d 29 (Neb. 1986)). "[A] key for distinguishing unfair competition from ordinary competition is an employee's appropriation of good will properly belonging to the employer." *Mens II*, 456 F. Supp. 3d at 1184 (internal quotation marks omitted) (citing *Am. Sec. Servs., Inc.*, 385 N.W.2d at 78). "Customers are an important aspect of good will because 'customer contact is one of the most important assets, sometimes the stock, of a business.'" *Id.* (quoting *Am. Sec. Servs., Inc.*, 385 N.W.2d at 79).The Nebraska Supreme Court also cited 6A A. Corbin, Corbin on Contracts § 1394 at 98 (1962) for the following proposition:

> Salesmen and solicitors are generally hired and paid a salary in order that they may help to build up custom, getting acquainted with customers and acquiring their good will. A promise to forbear to solicit such customers and to deprive the employer of the advantage of that good will is reasonable.

*Am. Sec. Servs., Inc.*, 385 N.W.2d at 79. Further, the Nebraska Supreme Court has provided that "[it] ha[s] identified protectable business interests as including employer's . . . confidential information, and trade secrets." *Gaver*, 856 N.W.2d at 130 (citing *Boisen*, 383 N.W.2d 29).

16

Knuppe was given confidential information and received substantial support throughout his employment with Farm Credit in order to become acquainted with customers and acquire their goodwill. Filing 1 at 4–5 (¶ 14). The Verified Complaint alleges that "Farm Credit . . . paid Knuppe to develop and maintain positive relationships and goodwill with customers and to garner repeat business, all for the benefit of Farm Credit." Filing 1 at 4–5 (¶ 14). Farm Credit enabled Knuppe's cultivation of customer good will, according to the Verified Complaint by giving Knuppe access to its confidential databases and customers, providing Knuppe with training, promotional items, and paying for meetings between Knuppe and customers, and "allow[ing] him to be the primary contact for Farm Credit to develop relationships with customers on its behalf and for its benefit." Filing 1 at 4–5 (¶ 14); *see also* Filing 24-2; Filing 24-3; Filing 24-4. Applying the Nebraska Supreme Court's caselaw to these facts shows that Farm Credit had a legitimate, protectable interest in the customers "with whom [Knuppe] actually did business and had personal contact while employed by [Farm Credit]." Filing 1-1 at 1–2 (¶ 2); *Am. Sec. Servs., Inc.*, 385 N.W.2d at 79. Additionally, Farm Credit has a legitimate protectable interest in the confidential information, such as the information contained in the alleged databases, and trade secrets acquired through these relationships. *Gaver*, 856 N.W.2d at 130 (citing *Boisen*, 383 N.W.2d 29).

The Court turns its attention to whether the restrictive covenants protecting the above legitimate interests are greater than reasonably necessary. *Aon Consulting, Inc.*, 748 N.W.2d at 638 (saying the restriction cannot be "greater than is reasonably necessary to protect the employer in some legitimate interest"). As explained above, the nonsolicitation language at issue in *Aon* case was nearly identical to the language contained in the Agreement here. *Aon Consulting, Inc.*, 748 N.W.2d at 633; *Mens II*, 456 F. Supp. 3d at 1183 (saying that a nonsolicitation clause containing

the same language as the clause at issue here accorded with *Aon* and Nebraska case law). Given that the language of the restrictive covenant at issue here has already been found by this Court to accord with Nebraska caselaw, and because the Agreement only prohibits Knuppe from working with customers with whom he actually worked and had personal contact while employed by Farm Credit, the Court finds that the restriction is not greater than reasonably necessary to protect Farm Credit's legitimate interest. *Mens II*, 456 F. Supp. 3d at 1186; Filing 1-1 at 1–2 (¶ 2). The nondisclosure language is similarly not greater than reasonably necessary to protect Farm Credit's legitimate interest in keeping its confidential information secret and secure because it is similarly tailored to the confidential information "acquired during or as a result of [Knuppe's] employment with [Farm Credit]." Filing 1-1 at 2 (¶ 4). Under the Agreement, Knuppe is free to use information not acquired during or as a result of the considerable resources Farm Credit expended to acquire such information for business in the same line of work. Filing 1 at 4–5 (¶¶ 13–14); Filing 1-1 at 2 (¶ 4); Filing 7-1 at 2 (¶ 7).

Knuppe appears to contest the enforceability of the agreement's nonsolicitation provision on the grounds that it does not protect a legitimate interest or is broader than reasonably necessary to protect that interest. Filing 19 at 5. Knuppe specifically argues that "the non-solicitation clause, combined with defendant's long-time connections with supposed customers, may not be enforceable when the evidence of actual communications by Defendant with a Customer and that Customer's reasons for changing agencies are disclosed." Filing 19 at 5. However, this Court has previously concluded that a company can have a protectable interest in customers that the former employee, himself, brought to that company. *Mens II*, 456 F. Supp. 3d at 1186 ("Applying the traditional agency concepts espoused by the Nebraska Supreme Court in *American Security*

*Services, Inc.* and the persuasive reasoning of the *Emerson Electric Co.*, *Naegele*, and *Mayer Hoffman McCann, P.C.* courts, the Court finds Farm Credit has a legitimate, protectable interest in the fifty customers that followed Mens to Farm Credit."). The Court also assessed the same language at issue here and found that "the Agreement's language and restrictions, mirroring those approved of by the Nebraska Supreme Court in *Aon Consulting, Inc.*, 275 Neb. at 653, 748 N.W.2d at 638, [were] not greater than [was] reasonably necessary to protect Farm Credit's interest. In summation, the Agreement is valid and enforceable." *Mens II*, 456 F. Supp. 3d at 1186. For these reasons, the Court finds Knuppe's above argument unavailing.

The Court's focus therefore turns to the prong of the tripartite *Aon* test that considers whether the restrictive covenant is "reasonable in the sense that it is not injurious to the public." *Mens II*, 456 F. Supp. 3d at 1181–82 (quoting *Aon Consulting, Inc.*, 748 N.W.2d at 638). Another judge of this court considered a remarkably similar fact pattern in issuing a preliminary injunction and found that "there [was] no indication that the Contract [containing identical nonsolicitation of customers and nondisclosure of confidential information clauses] [was] injurious to the public. The Contract purport[ed] to protect Farm Credit's business good will and its ability to provide service to its customers." *Mens I*, 2019 WL 285962, at *3, 5 (issuing a preliminary injunction in response to a Motion for TRO or Preliminary Injunction seeking enforcement of the same restrictive covenants against a former employee). The nonsolicitation and nondisclosure clauses in that case are identical to the clauses at issue here. *Mens I*, 2019 WL 285962, at *2 (providing the text of clauses "2" and "4"); Filing 1-1 at 1–2 (¶¶ 2, 4). The Court identifies no material dissimilarities with the fact pattern leading to the preliminary injunction in *Mens I*, 2019 WL

285962, finds no other reason for departure, and finds no error in Judge Smith Camp's reasoning relating to the absence of public injury. *Id.*; Filing 1; Filing 1-1; Filing 7-1.

The Court considers the outstanding prong of the tripartite *Aon* test, which asks whether the restrictive covenants are "unduly harsh and oppressive on the employee." *Mens I*, 2019 WL 285962, at *3 (quoting *Aon Consulting, Inc.*, 748 N.W.2d at 638). Under this prong, Nebraska courts consider several factors in assessing whether a restrictive covenant is "unduly harsh." *Id.* These factors include,

> (1) the risk to the employer of losing customers, (2) the extent of participation in retaining customers, (3) the good faith of the employer, (4) the nature and extent of the business position Mens held with Farm Credit, (5) the employee's training, health, education, and needs of her family, (6) the existence of sources of general knowledge pertaining to the identity of customers, (7) current conditions of employment, (8) the necessity of changing her occupation or residence, (9) whether the restraint is necessary to protect a legitimate interest, and (10) the inequality of bargaining power. *See C&L Indus., Inc. v. Kiviranta*, 698 N.W.2d 240, 250 (Neb. App. 2005) (citing *Vodra*, 385 N.W.2d at 80).

*Mens I*, 2019 WL 285962, at *4.

First, as to the risk to the employer of losing customers, Farm Credit alleges that the "Final Audit Report" shows that Knuppe has continued to work with Gilbert Cattle Company, either by already taking their business from Farm Credit or by acting in furtherance of that goal, as Knuppe allegedly drafted the request letter sent by Gilbert Cattle Company to Farm Credit requesting that all of Gilbert Cattle Company's crop insurance business be consolidated with Rain and Hail, a carrier that Farm Credit does not have an agency contract with. Filing 7-1 at 4 (¶ 19–25); Filing 7-2; Filing 7-3. Farm Credit has adequately alleged that Knuppe has been working with at least one Customer and that this relationship constitutes, at minimum, a risk of losing Gilbert Cattle Company as a customer and shows a reasonable risk of losing other Customers as well. *See* Filing

1 at 7 (¶ 23) (saying that at least six other Customers have cancelled policies with Farm Credit and that "[u]pon information and belief, those Customers moved that business to Knuppe and/or Logic AG"); Filing 24-1 at 3 (¶ 13) (naming those six customers and saying that "Knuppe was the agent of record" and "did business and had personal contact" with them while employed with Farm Credit; *Mens I*, 2019 WL 285962, at *4 (saying the first factor is "the risk to the employer of losing customers").

Second, the Court considers Farm Credit's participation in retaining customers. *Mens I*, 2019 WL 285962, at *4 (saying the second factor is "the extent of participation in retaining customers"). Farm Credit has participated substantially in retaining customers. Farm Credit alleges that it paid Knuppe for the purpose of "develop[ing] and maintain[ing] positive relationships and goodwill with customers and to garner repeat business, all for the benefit of Farm Credit." Filing 1 at 4 (¶ 14). Additionally, Farm Credit avers that it "fostered and supported those relationships through training, promotional items, and paying for meetings between Knuppe and customers, among other support." Filing 1 at 4–5 (¶ 14); Filing 24-2 (showing trainings); Filing 24-4 (showing company expenditures). Third, the Court is satisfied that Farm Credit acted in good faith, *Mens I*, 2019 WL 285962, at *4 (saying the third factor is "the good faith of the employer"), as the nonsolicitation clause is for a reasonable period of time (i.e., two years) and is limited to those Customers with whom Farm Credit actually did business and had personal contact while employed by Farm Credit. Filing 1-1 at 1–2 (¶ 2). The nondisclosure clause is limited to information "acquired during or as a result of [Knuppe's] employment with [Farm Credit]." Filing 1-1 at 2 (¶ 4). Farm Credit's good faith is further supported by the fact that the defendant was not fired but voluntarily resigned.

The fourth factor similarly favors the enforcement of the Agreement because, as explored above, the business position Knuppe held with Farm Credit was for the purpose of creating goodwill with customers and acquiring advantageous, confidential information that would ultimately belong to Farm Credit. *Mens I*, 2019 WL 285962, at *4 (saying the fourth factor is the nature and extent of the business position Knuppe held with Farm Credit); Filing 1 at 4 (¶ 14); *see* Filing 1 at 3–4 (¶ 11). Thus, enforcement of the Agreement would not be unduly harsh under the fourth factor. Although the Court has somewhat limited information relating to the fifth factor, Farm Credit has alleged that Knuppe received "in excess of $100,000 annually" in compensation for his work and received extensive training that can be used in the same line of business so long as that work is not for those Customers he worked with at Farm Credit or through use of confidential information. *Mens I*, 2019 WL 285962, at *4 (saying the fifth factor is the employee's training, health, education, and needs of her family); Filing 7-1 at 1–2 (¶¶ 5, 7). The Court is satisfied that this factor similarly favors the Agreement's enforcement. The sixth factor considers "the existence of sources of general knowledge pertaining to the identity of customers." *Mens I*, 2019 WL 285962, at *4. Farm Credit's customer information is securely and secretly stored. Filing 1 at 4 (¶ 13). The Court finds no indication that the identities of the customers are otherwise commonly known.

Seventh, Knuppe voluntarily resigned and is allegedly employed with Logic AG. *Mens I*, 2019 WL 285962, at *4 (saying the seventh factor is current conditions of employment); Filing 1 at 6 (¶¶ 19, 21). Therefore, considerations relating to employment conditions are not relevant here. Eighth, the Agreement does not contain any geographic limitation on work. *Mens I*, 2019 WL 285962, at *4 (saying the eighth factor is the necessity of changing his occupation or residence);

22

Filing 1-1 at 1–2 (¶ 2). The Agreement allows Knuppe to work in the same community, and in the same line of work, so long as he does not run afoul of the limited restrictions articulated by the Court elsewhere. Filing 1-1 at 1–2 (¶ 2). Ninth, as the Court explained above, the Agreement protects legitimate interests. *Mens I*, 2019 WL 285962, at *4 (saying the ninth factor is whether the restraint is necessary to protect a legitimate interest). Finally, much like *Mens I*, "no evidence suggests that there is an inequality in bargaining power between [Knuppe] and Farm Credit." 2019 WL 285962, at *4 (saying the last factor is the inequality of bargaining power). For the above reasons, the Court does not find the Agreement's nonsolicitation of customers and nondisclosure of confidential information clauses unduly harsh at this stage.

### d.  Knuppe's Breach of the Agreement

Based on the evidence discussed the above, the Court is satisfied that the Agreement's nonsolicitation of customers and nondisclosure of confidential information clauses are valid and enforceable under Nebraska law. The Court must therefore consider whether Farm Credit has shown that Knuppe violated the Agreement. The Nebraska Supreme Court has stated, "[I]n order to recover in an action for breach of contract, the plaintiff must plead and prove [1] the existence of a promise, [2] its breach, [3] damage, and [4] compliance with any conditions precedent that activate the defendant's duty." *Morris*, 26 N.W.3d at 312 (Neb. 2025) (bracketed numbers inserted) (*Henriksen*, 643 N.W.2d 652). The evidence before the Court shows a violation of the agreement.

First, through the Agreement, Knuppe promised to Farm Credit:

For a period of two (2) years following the termination (voluntary or involuntary, for any reason or no reason) of [Knuppe's] employment with [Farm Credit], [Knuppe] . . . will not call on or solicit the business of, or sell to, or service (directly or indirectly, on [Knuppe's] own behalf or in association with or on behalf of any

other individual or entity), any of the customers of [Farm Credit] with whom [Knuppe] actually did business and had personal contact while employed by [Farm Credit] except to the extent such activities are unrelated to and not competitive with the business, products or services that [Knuppe] offered or provided on behalf of [Farm Credit] and cannot adversely affect the relationship or volume of business that [Farm Credit] [has] with such customers.

Filing 1-1 at 1–2 (¶ 2).

Second, Farm Credit has alleged a breach of the above promise. Specifically, Farm Credit has alleged that Knuppe is working with a Customer, Gilbert Cattle Company, that did business with Knuppe while he was employed by Farm Credit for the kind of insurance work that Knuppe was engaged in at Farm Credit. Filing 7-1 at 4 (¶¶ 19–24); Filing 7-2; Filing 7-3. Knuppe has allegedly called on and provided service for Gilbert Cattle Company, and the evidence supports that allegation, including evidence that he has created a letter requesting that all of Gilbert Cattle Company's business insurance be consolidated under a carrier that Farm Credit does not have an agency contract with. Filing 7-2. These actions are in breach of the above promise.

Third, there is damage here for two reasons. First, the request letter created by Knuppe and sent by Gilbert is effectively a vehicle to withdraw Gilbert Cattle Company's current business from Farm Credit given that Farm Credit does not have an agency contract with the requested carrier. Filing 7-2 at 4 (¶ 24). The unavoidable inference the Court draws from the withdrawal is that the withdrawal is for the purpose of directing the business towards Knuppe. Filing 7-1 at 4 (¶ 24). Second, Knuppe's work with Gilbert Cattle Company has already impaired the customer goodwill that Farm Credit has allegedly attempted to protect and cultivate over Knuppe's tenure at Farm Credit in that Gilbert Cattle Company's business relationship with Farm Credit has been impaired by Knuppe's present work with Gilbert Cattle Company. Filing 7-1 at 1–2.

24

Knuppe disputes that a likelihood of success on the merits has been shown. First, Knuppe asserts that "[t]he Jesena [sic] Declaration does not name the 6 canceling customers or explain how Mr. Knuppe's actions had anything to do with 6 policy cancellations." Filing 19 at 6. As shown above, however, Farm Credit has sufficiently alleged that Knuppe is working with a Customer, Gilbert Cattle Company, that did business with Knuppe while he was employed by Farm Credit for the kind of insurance work that Knuppe was engaged in at Farm Credit. Filing 7-1 at 4 (¶¶ 19–24); Filing 7-2; Filing 7-3. Additionally, the second Jesina affidavit names the six cancelling customers and states that "Knuppe was the agent of record" and "did business and had personal contact while he was employed by Farm Credit" for and with each of them. Filing 24-1 at 3. For the reasons articulated above, this evidence is sufficient to show a "'fair chance' of prevailing." *Schmitt,* 148 F.4th at 966 (*Sleep Number Corp.*, 33 F.4th at 1016). Knuppe also argues that the Customers can choose who to do business with and may have independently moved their business to Knuppe in order to stay with Rain and Hail. *See* Filing 19 at 4 ("Plaintiff assumes but does not prove that 6 customers have moved to a different agency because of Defendant's actions. If and when those customers are identified, it may be shown that these were long time friends and people with old connections to Defendant, whose transfer of business was independent of any actions by Defendant after he left Farm Credit."). However, a customer's choice does not relieve Knuppe of his contractual obligations. Filing 1-1 at 1–2 (¶ 2).

The Court finds the Agreement's nonsolicitation of customers and nondisclosure of confidential information clauses are valid and enforceable under Nebraska law and similarly finds that Farm Credit has shown a violation of the Agreement at this time. Therefore, the first *Dataphase* factor weighs heavily in favor of a preliminary injunction. *Wildhawk Invs., LLC*, 27

25

F.4th at 593 (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1041) ("[Factor 1] requires the movant to demonstrate "at least a 'fair chance of prevailing.'").

### 2. Irreparable Harm

The next *Winter/Dataphase* factor the Court will consider is whether the movant "is likely to suffer irreparable harm in the absence of [injunctive] relief." *Bio Gen*, 142 F.4th at 600 (quoting *Winter*, 555 U.S. 20); *see also Schmitt*, 148 F.4th at 966 (stating that a movant must demonstrate "the threat of irreparable harm to the movant" (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114)).

#### a. The Parties Arguments

Farm Credit argues that it "and its Customers are at substantial risk of irreparable harm if Knuppe and those acting in concert with him are not enjoined from soliciting and/or otherwise accepting their business during the reasonable 2-year restricted period specified in the Agreement's non-solicitation provision." Filing 5 at 2. Farm Credit maintains that this is so because damages cannot compensate for loss of goodwill and confidential business information. *See* Filing 5 at 13. In response, Knuppe maintains that "Plaintiff admits that its damages are speculative, that there is no way to calculate the damages attributable to the loss of Customer relationships." Filing 19 at 2. Farm Credit reasserted much of its argument relating to irreparable harm in its reply, saying "[t]he Court correctly concluded that threatened loss of customer goodwill in the context of the crop insurance industry constitutes a threat of irreparable harm" and that "[t]he inability to compute [losses relating to goodwill] does not render damages speculative; it demonstrates why damages are not adequately compensable at law." Filing 22 at 8–9.

#### b. Requirements to Show Irreparable Harm

The Eighth Circuit recently explained,

A plaintiff seeking a preliminary injunction must show, among other things, that it is likely to suffer irreparable harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Even where a permanent injunction may be appropriate relief after a final decision on the merits, preliminary injunctive relief is not necessarily warranted if any interim harm can be remedied in a final judgment. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

*Denali Summit, LLC v. Union Elec. Co.*, 158 F.4th 896, 899 (8th Cir. 2025). The Eighth Circuit has also stated, "A party is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable harm is likely in the absence of an injunction." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 927–28 (8th Cir. 2025) (cleaned up) (quoting *Sleep No. Corp.*, 33 F.4th at 1018, in turn quoting *Winter*, 555 U.S. at 22).

Pertinent to the facts in this case, the Eighth Circuit as stated that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *Medicine Shoppe Intern., Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). This is because "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.* The Eighth Circuit has also indicated that a violation of a valid and enforceable restrictive covenant suggests irreparable harm. *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984)) ("First, N.I.S. has shown a threat of irreparable harm. The district court found that the individual defendants were each affirmatively soliciting business from holders of Ozark/N.I.S. policies. If the noncompete agreements are valid, then we think an irreparable injury has been shown."). The United States

District Court for the Eastern District of Missouri has similarly maintained that "[i]rreparable harm is also properly presumed where there is evidence that a covenant not to compete is breached or confidential, proprietary information is being improperly used." *Copeland LP v. Thurston*, 732 F. Supp. 3d 1003, 1012 (E.D. Mo. 2024) (citing *H&R Block Tax Servs. LLC v. Haworth*, 2015 WL 5601940 at \*3 (W.D. Mo. Sept. 22, 2015)). "Monetary relief . . . cannot fully remedy Plaintiff's loss of goodwill, confidential information, and other legitimate business advantage." *Copeland LP*, 732 F. Supp. 3d. at 1012.

c.  Farm Credit Shows Irreparable Harm

Farm Credit avers that Knuppe's violation of the agreement is causing damage to the customer goodwill that it built over the course of Knuppe's employment. As the Court addressed above, on the evidence before the Court, Knuppe has violated the Agreement by effectively calling on and providing service for Gilbert Cattle Company. *See* Filing 7-1 at 4 (¶¶ 19–25); Filing 7-2. Knuppe's present work with Gilbert Cattle Company has caused Gilbert Cattle Company to effectively request that its business, at the minimum, be withdrawn from Farm Credit. It is also a natural and almost unavoidable inference that the withdrawal of business from Farm Credit is for the purpose of directing the policies towards Knuppe, as Knuppe was the author of the request letter that Gilbert Cattle Company sent to Farm Credit. *See* Filing 7-1 at 4 (¶¶ 19–25). Given the nearly identical fact pattern before the Court presently, the Court finds no error in the application of the *Mens I* court's analysis relating to irreparable harm here:

> Farm Credit has demonstrated at this stage that there is no adequate remedy at law for [Knuppe's] alleged breach of the [Agreement]. Because of the approaching deadline for the placement of crop insurance, and the nature of the crop insurance industry, it would be difficult to identify how much crop insurance business Farm Credit has lost and may lose in the future due to [Knuppe's] alleged breach. Because

28

the harm resulting from [Knuppe's] actions is not easily remedied or quantified, Farm Credit has adequately demonstrated a threat of irreparable harm.

*Mens I*, 2019 WL 285962, at \*5; *see also Medicine Shoppe Intern., Inc.*, 336 F.3d at 805; *Copeland LP*, 732 F. Supp. 3d. at 1012 ("Monetary relief . . . cannot fully remedy Plaintiff's loss of goodwill, confidential information, and other legitimate business advantage."). Thus, this *Dataphase* factor also weighs heavily in favor of granting a preliminary injunction.

### 3. Balance of Harms

#### a. The Parties' Arguments

Farm Credit argues that the balance of equities favors Farm Credit because Farm Credit is at risk of losing the goodwill Knuppe developed and maintained for Farm Credit. *See* Filing 5 at 7–9. Knuppe argues in response that "[Farm Credit] is asking for an injunction beginning as soon as possible, and extending 2 years beyond that date. Doc. 1, page 10, Plaintiff's Verified Complaint. This would be well beyond the reach of Plaintiff's own contract with Defendant. It would also unfairly balance the equities in favor of Plaintiff and against Defendant." Filing 19 at 6–7. Additionally, Knuppe maintains that the non-solicitation clause is unduly harmful to him because of his "long-time connections with supposed customers." Filing 19 at 5. In reply, Farm Credit maintains that Knuppe's argument "should be rejected because Knuppe himself agreed to a two-year restriction, which this Court has found to be reasonable under the circumstances." Filing 22 at 10–11.

#### a. The Balance of Harms Favors Farm Credit

The Court now considers whether the balance of equities tips in Farm Credit's favor. *Bio Gen LLC*, 142 F.4th at 600 (quoting *Winter*, 555 U.S. at 20, and also citing *Dataphase Sys., Inc.*, 640 F.2d at 114 (en banc)). The Court considers "the state of balance between this harm and the

injury that granting the injunction will inflict on other parties' litigant." *Schmitt*, 148 F.4th at 966 (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114). "To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying the injunction." *Mens I*, 2019 WL 285962, at *5 (citing *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994)).

As explained above, Farm Credit has shown that its customer goodwill either has been or will be harmed. Farm Credit has provided considerable resources for its Insurance Officers to create and develop relationships with customers on Farm Credit's behalf. Filing 1 at 4–5 (¶ 14); Filing 24-2; Filing 24-4. Therefore, Farm Credit is at risk of losing the goodwill it has created and established with its customers over the years that employees like Knuppe have worked for it should Knuppe continue to work with the Customers that he formerly did business with during his employment at Farm Credit. On the other hand, the harm flowing to Knuppe, should a preliminary injunction be issued, would be limited in that Knuppe would only be restricted according to the Agreement that he made and that the Court has found to be valid and enforceable. Filing 1-1 at 1–2 (¶ 2). Additionally, the Agreement does not forbid Knuppe from engaging in the line of business he engaged in as an employee at Farm Credit. Filing 1-1 at 1–2 (¶ 2). Instead, Knuppe is prohibited for a period of two years from working with those Customers he did business with at Farm Credit and in using confidential information acquired in his former employment. Filing 1-1 at 1–2 (¶¶ 2, 4). Farm Credit has provided Knuppe with substantial training in addition to compensation in excess of over $100,000. Filing 7-1 at 1–2 (¶¶ 5, 7). Knuppe can use this training in the same line of work subject to limited and reasonable restrictions. Filing 1-1 at 1–2 (¶ 2). Therefore, the balance of harms weighs in Farm Credit's favor. *Schmitt*, 148 F.4th at 966 (quoting *Dataphase*

*Sys., Inc.*, 640 F.2d at 114) (saying courts consider "the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant.").

Knuppe's objections are unavailing. First, Knuppe argues that the duration of the injunction requested by Farm Credit points in his favor. However, Farm Credit has clarified in its brief and oral argument that it is only seeking an injunction through June 18, 2027, which is two years following Knuppe's last day of employment at Farm Credit. Filing 22 at 11. Additionally, Knuppe argues that his "long-time connections with supposed customers" point in his favor with respect to the balance of harms. Filing 19 at 5. However, Knuppe consented to this circumstance when entering valid and enforceable restrictive covenants that encompass customers with whom Knuppe had a prior relationship.

### 4. Public Interest

#### a. The Parties' Arguments

Farm Credit argues that the public interest is "best served by enforcing the Agreement because Knuppe seeks to move the Customers' crop insurance primarily to enrich himself and not to serve the Customers' interests." Filing 5 at 7. Knuppe does not offer any argument specifically relating to public interest in his response. Filing 19. Farm Credit does not offer any further argument specifically relating to the public interest in its reply, saying instead that "Knuppe's arguments do not warrant a departure from the Court's prior conclusion that the *Dataphase/Winter* factors are satisfied here." Filing 22 at 10 (original emphasis omitted).

#### b. The Public Interest Favors Farm Credit

The Court's attention turns to the last *Dataphase* factor, the public interest. Knuppe did not dispute the determination on this factor made by the Court in its TRO order in his brief or in the

March 30, 2026, hearing. The Court agrees with the reasoning offered by Judge Smith Camp in *Mens I*. That is, "Courts have held the public interest favors a fair, competitive marketplace." *Mens I*, 2019 WL 285962, at \*5 (citing *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1134 (D. Minn. 1996), *aff'd sub nom. Minnesota Min. & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305 (8th Cir. 1997)). On the evidence before the Court, the public interest would not be served by permitting Knuppe's appropriation of goodwill belonging to Farm Credit and the use of other unfair advantages against Farm Credit. *See Mens I*, 2019 WL 285962, at \*5.

Thus, all *Dataphase* factors weigh in favor of granting Farm Credit's motion for a preliminary injunction. *Schmitt*, 148 F.4th at 966 (quoting *Dataphase Sys., Inc.*, 640 F.2d at 114).

5. *Diligence*

Neither party presented any argument relating to Farm Credit's diligence in seeking injunctive relief. Filing 5; Filing 19; Filing 22. As the Court observed in its March 11, 2026, order, however, both the United States Supreme Court and the Eighth Circuit Court of Appeals have recognized the importance of diligence in seeking injunctive relief. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *Ng*, 64 F.4th at 997 (explaining that unreasonable delay "is a sufficient basis to deny" a preliminary injunction); *see also Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024) (citing *Benisek* and *Ng*). The parties did not present any argument in their briefs or in the March 30, 2026, hearing on the subject, and no evidence submitted by the parties causes the Court to rethink its prior conclusion relating to Farm Credit's diligence. Filing 11 at 27; Filing 20-1; Filing 24-1 through Filing 24-4.

32

### C.  Amount in Controversy

Knuppe's response brief cursorily raises the issue of whether Farm Credit has alleged "$75,000 or more being in dispute." Filing 19 at 7. The Verified Complaint asserts that this Court has diversity jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a)(1). Section 1332 requires that the amount in controversy exceed $75,000 in order for the court to have diversity jurisdiction. 28 U.S.C. § 1332(a). "A complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Peterson v. The Travelers Indem. Co.*, 867 F.3d 992, 995 (8th Cir. 2017) (cleaned up).

Farm Credit has sufficiently alleged an amount in controversy exceeding $75,000 here. First, Farm Credit alleges in its verified complaint that "[he amount in controversy exceeds $75,000.00." Filing 1 at 1. Farm Credit likewise alleges "at minimum . . . Farm Credit conservatively estimates that it will lose well over $75,000 if the business formerly serviced by Knuppe is lost." Filing 1 at 8 ¶ 24. The second Jesina declaration also states that "[u]nless the customer opts to leave Farm Credit, the crop insurance policies will continue to roll over with Farm Credit." Filing 24-1 at 3 (¶ 14). Additionally, the Verified Complaint alleges that "many customers place their coverage through the same agent. If the Customers who have moved (or continue to move) their forage and grazing coverage also move their other coverage, Farm Credit's losses will increase." Filing 1 at 8 (¶ 25). Moreover, the first Jesina declaration states that all of the client portfolios "might have grown if they [were] not transferred," and that they may have increased in value by "the assets the clients may have earned, inherited or won over time." Filing 7-1 at 5 (saying the value of the client portfolios might also increase if not transferred because of

potential referrals and because "Customer acres grow each year due to different factors including leasing, inheritance, purchase of farms or cooperative ventures the producer enters").

Farm Credit's sworn statements regarding the amount lost on the customers who have left Farm Credit thus far due to Knuppe's alleged conduct, the way crop insurance business previously rolled over for these customers year after year, along with the nature of the business at issue, convinces the Court that Farm Credit has alleged an amount in controversy exceeding $75,000. In particular, it does not appear to the Court "to a legal certainty that the claim is really for less than the jurisdictional amount." *Peterson*, 867 F.3d at 995.

### III. CONCLUSION

The Court, having considered the parties' written and documentary submissions on the March 9, 2026, motion for preliminary injunction and the arguments presented at the March 30, 2026, preliminary injunction hearing finds that the *Dataphase* factors favor the issuance of a preliminary injunction.

IT IS THEREFORE ORDERED that the part of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Filing 4, seeking a preliminary injunction is granted as follows:

1. Pursuant to Federal Rule of Civil Procedure 65(a), Defendant and those in active concert or participation with him are enjoined from violating the nonsoliciation of customers and nondisclosure of confidential information provisions of the 2015 Agreement between Knuppe and Farm Credit, Filing 1-1 at 1–2 (¶¶ 2, 4), through June 18, 2027, or until this Court orders otherwise, the relevant text of which is included in Part I of this Order;

2. Under Federal Rule of Civil Procedure 65(c), this preliminary injunction shall issue immediately, where Farm Credit has previously posted a security or bond in the amount of $15,000 as security for the payment of such costs and damages as may be incurred or suffered by a party who is subsequently found to be wrongfully enjoined or restrained hereby.

Dated this 31st day of March, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

35